*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FITNESS INTERNATIONAL LLC,

Plaintiff-Appellant,

UNPUBLISHED
February 22, 2024

v

No. 363889
Oakland Circuit Court
LC No. 2021-187516-CB

COLE LA BLOOMFIELD HILLS MI LLC,

Defendant-Appellee.

Before: GADOLA, C.J., and BORRELLO and BOONSTRA, JJ.

PER CURIAM.

Plaintiff appeals as of right the order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) in favor of defendant. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises from a dispute over whether rent was due under a lease for the period that plaintiff's business was closed pursuant to various governmental orders issued during the 2020 COVID-19 pandemic. The material facts are relatively straightforward and largely undisputed.

Plaintiff operates health clubs and fitness centers. Defendant owns a parcel of land in Bloomfield Hills, which it leases to plaintiff. Plaintiff's facility on the premises was closed from approximately March 16, 2020, through September 8, 2020, following Executive Orders issued by the Michigan Governor in response to the global COVID-19 pandemic. Plaintiff did not pay any rent for April through September 2020.

Plaintiff was able to resume operations in September 2020, although restrictions that included limitations on occupant capacity remained in effect through most of June 2021. Plaintiff resumed paying its rent in full in October 2020.

In April 2021, defendant sent a demand to plaintiff for the delinquent rent. Plaintiff apparently paid the rent demanded, and it subsequently initiated this action in which it essentially argued that it was not obligated to pay rent during the closure period and that its rent should have

been proportionately abated during the time that restrictions on the capacity at which it could use its facility remained in place.

Defendant moved for summary disposition. Plaintiff opposed the motion and requested summary disposition in its favor under MCR 2.116(I)(2). The trial court issued a written opinion and order granting summary disposition in favor of defendant under MCR 2.116(C)(10). The trial court concluded that defendant did not breach the lease and that plaintiff's obligation to pay rent was not excused under the force majeure clause or the doctrines of frustration of purpose, impossibility, or impracticability. This appeal followed.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo. *McMaster v DTE Energy Co*, 509 Mich 423, 431; 984 NW2d 91 (2022). Summary disposition under MCR 2.116(C)(10) is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. at 139-140 (quotation marks and citation omitted). "The court must consider all evidence submitted by the parties in the light most favorable to the party opposing summary disposition." *McMaster*, 509 Mich at 431.[1] Plaintiff countered defendant's motion for summary disposition by requesting summary disposition under MCR 2.116(I)(2). MCR 2.116(I)(2) states: "If it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." Additionally, contract interpretation presents a question of law that we review de novo. *Clark v Al-Amin*, 309 Mich App 387, 394; 872 NW2d 730 (2015).

## III. ANALYSIS

Plaintiff argues the trial court improperly granted summary disposition in favor of defendant because: (1) defendant breached the lease; (2) the lease's force-majeure provision excused plaintiff's obligation to pay rent; and (3) the doctrines of frustration of purpose and impossibility and impracticability excused plaintiff's obligation to pay rent. The issue in this case is whether plaintiff was excused from paying rent for any of the aforementioned reasons while the government's COVID-19 closure orders were in effect.

Plaintiff's arguments require this Court to examine and construe the language of the parties' contractual lease agreement. "A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). "The goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties.

---

[1] We note while defendant also moved for summary disposition under MCR 2.116(C)(8), the trial court expressly declined to grant relief under MCR 2.116(C)(8).

If the language of the contract is clear and unambiguous, it must be enforced as written." *Clark*, 309 Mich App at 394 (quotation marks and citations omitted).

## A. DEFENDANT'S BREACH OF THE LEASE

Plaintiff first argues that defendant breached the provision of the lease in § 1.9 guaranteeing plaintiff the right to operate its health club and fitness facility business throughout the lease term because plaintiff was prohibited from operating its business on the premises during the pandemic closure period. Consequently, plaintiff argues, it was not obligated to pay rent during this period as a result of defendant's breach and the failure of the primary consideration on which the contractual lease agreement was based, which deprived plaintiff of the benefit of its bargain.

Section 1.9 of the lease states in relevant part that the initial use of the premises would be "for the operation of a health club and fitness facility" and that plaintiff "shall have the right throughout the Term and all Option Terms to operate for uses permitted under this Lease." Plaintiff also relies on Sections 2.1 and 2.2 of the lease to support its contention that defendant breached the lease. Section 2.1 states that "[i]n consideration of the rents agreed to be paid and of the covenants and agreements made by the respective parties hereto, Landlord hereby demises and leases to Tenant and Tenant hereby leases from Landlord the Premises, upon and subject to the terms, conditions and provisions set forth in this Lease." Section 2.2 provides in relevant part:

> In consideration for Tenant entering into this Lease and as an inducement for Tenant to lease the Premises, Landlord makes the following representations, warranties and covenants in addition to such other representations, warranties and covenants as may be contained elsewhere in this Lease . . . each of which is material and is being relied upon by Tenant. All of such representations, warranties and covenants shall survive the execution and delivery of the Lease by Tenant and Landlord.
>
> Landlord hereby represents, warrants and covenants to Tenant that:
>
> \* \* \*
>
> (b) Landlord has good and insurable title to the Premises in fee simple, free and clear of all tenancies, covenants, conditions, restrictions, encumbrances, liens and easements which might in any manner or to any extent prevent or adversely affect the use of the Premises by Tenant for Tenant's intended purposes, or disturb Tenant's peaceful and quiet possession and enjoyment thereof, and that there are, and will be at the Commencement Date no unrecorded or inchoate liens affecting the Premises. Landlord agrees to defend said title and represents and warrants that, so long as Tenant substantially fulfills the material covenants and conditions of this Lease required by Tenant to be kept and performed, *Tenant shall have, throughout the entire Term and any extensions and renewals hereof, peaceful and quiet possession and enjoyment of the Premises without any ejection by Landlord or by any other person by, through or under Landlord.*
>
> \* \* \*

> *Landlord shall indemnify, defend and hold harmless Tenant from and against any and all losses, demands, claims, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) arising as a result of any inaccuracy or breach of any representation, warranty or covenant of Landlord set forth in this Lease*. [Emphasis added.]

Plaintiff argues on appeal that because it was deprived of the use of the premises, as guaranteed under the lease, for purposes of operating a health club and fitness facility, plaintiff was excused from paying rent during the period in which plaintiff's intended use of the premises was impaired.

Plaintiff's argument sounds in a claim that the covenant of quiet enjoyment was breached.[2] "There goes with every rental of premises the right of beneficial enjoyment by the tenant for the purpose for which the premises are rented, at least to the extent disclosed to the lessor at the making of the lease. Such enjoyment the landlord may not destroy or seriously interfere with, in use by himself or permitted use by others, of any part of the premises occupied in conjunction therewith." *Grinnell Bros v Asiuliewicz*, 241 Mich 186, 188; 216 NW 388 (1927). "[T]he covenant of quiet enjoyment is breached only when the landlord obstructs, interferes with, or takes away from the tenant in *a substantial degree* the beneficial use of the leasehold." *Slatterly v Madiol*, 257 Mich App 242, 258; 668 NW2d 154 (2003) (quotation marks and citations omitted).

Here, it is undisputed that plaintiff's facility was closed as a result of the COVID-19 Executive Orders. There is no evidence that *defendant*, as landlord, obstructed, interfered with, or otherwise prevented plaintiff from using the premises for purposes of operating a health club and fitness facility. See *id*. Moreover, "[o]ne of the conditions of all leases is that the lessee shall be subject to such interference or disturbance of his possession as results from the exercise by public authorities of their rights, under either the power of eminent domain or police regulations." *Tucker v Gvoic*, 344 Mich 319, 323; 74 NW2d 29 (1955) (quotation marks and citation omitted). Mere "interference or disturbance of [the tenant's] possession as results from the exercise of the police power" does not constitute a breach of the covenant of quiet enjoyment." *Id*. Accord *Fitness Int'l, LLC v Nat'l Retail Props Ltd Partnership*, unpublished per curiam opinion of the Court of Appeals, issued October 13, 2022 (Docket No. 358680), p 7 (" 'The interference with a tenant's possession and enjoyment of the demised premises by public officials in the exercise of police power, if not due to any default on the part of the landlord, is not a breach of the landlord's covenant of quiet enjoyment.' ") (quoting 49 Am Jur 2d, Landlord and Tenant § 481, pp 511-512); cf. also *Bowen v Clemens*, 161 Mich 493, 494-495; 126 NW 639 (1910) ("But accidental injuries to the premises

---

[2] Although plaintiff does not expressly attach this label to its claim, it is clear from the nature of plaintiff's argument that its argument is grounded in the covenant of quiet enjoyment. This Court determines the "exact nature of the claim" by scrutinizing a party's pleadings in their entirety and "looking beyond mere procedural labels." *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710-711; 742 NW2d 399 (2007). This Court is "not bound by a party's choice of labels." *Id*. at 715.

from natural causes, which interfere with the lessee's enjoyment of the premises, are not considered a breach of the lessor's covenant for quiet enjoyment.").

Hence, the trial court did not err by granting summary disposition in defendant's favor on plaintiff's claim for breach of the covenant of quiet enjoyment in the lease.[3]

## B. THE FORCE-MAJEURE PROVISION

Next, we address plaintiff's claim that it was excused from paying rent during the closure period under the lease's force-majeure provision because the governmental restrictions constituted force-majeure events.

"The purpose of a force majeure clause is to relieve the lessee from harsh termination of the lease due to circumstances beyond its control that would make performance untenable or impossible." *Erickson v Dart Oil & Gas Corp*, 189 Mich App 679, 689; 474 NW2d 150 (1991) (citation omitted). "Force-majeure clauses are typically narrowly construed, such that the clause will generally only excuse a party's nonperformance if the event that caused the party's nonperformance is specifically identified." *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 447; 886 NW2d 445 (2015) (quotation marks and citations omitted). "A force majeure clause cannot be invoked to excuse performance where the delaying condition was caused by the lessee and could have been prevented by the exercise of prudence, diligence, and care." *Erickson*, 189 Mich App at 688 (citation omitted).

Here, the lease's force-majeure provision in § 22.3 states:

> If either party is delayed or hindered in or prevented from the performance of any act required hereunder because of strikes, lockouts, inability to procure labor or materials, failure of power, restrictive laws, riots, insurrection, war, fire, inclement weather (and any effects from inclement weather) or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed, financial inability excepted (any "Force Majeure Event"), subject to any limitations expressly set forth elsewhere in the Lease, performance of such act shall be excused for the period of the Force Majeure Event and the period for the performance of such act shall be extended for an equivalent period (including delays caused by damage and destruction caused by such Force Majeure Event). Delays or failures to perform resulting from lack of funds or which can be cured by the payment of money shall not be Force Majeure Events.

---

[3] Furthermore, contrary to plaintiff's assertion on appeal, plaintiff's inability to operate its business on the premises during the closure period was also not the result of an "inaccuracy" in the lease for purposes of the indemnification and hold-harmless provision in § 2.2. Cf. *Slatterly*, 257 Mich App at 258; *Tucker*, 344 Mich at 323. Thus, plaintiff also has not demonstrated any entitlement to relief with respect to its claim under the indemnification and hold-harmless clause in § 2.2 because plaintiff has not established "any inaccuracy or breach of any representation, warranty or covenant of Landlord set forth in this Lease."

Plaintiff argues on appeal that the COVID-19 Executive Orders were "restrictive laws" beyond the reasonable control of either party that constituted a Force Majeure Event excusing plaintiff's obligation to pay rent during the closure period. However, although the orders may have prevented plaintiff from operating its health club and fitness facility on the premises—and generating the revenue related to such business activities—during the closure period, the orders did not prevent plaintiff from *paying rent*. Because the Executive Orders did not delay, hinder, or prevent plaintiff from fulfilling its obligation under the lease to pay rent, the act of paying rent was not excused under the force majeure clause as a result of the Executive Orders. *Erickson*, 189 Mich App at 689; *Kyocera Corp*, 313 Mich App at 447.

The fact that plaintiff was obligated to pay rent even though the Executive Orders may have impaired plaintiff's usual method of generating revenue through using the premises as a health club and fitness facility is insufficient to warrant relief under the force majeure clause. See *Kyocera Corp*, 313 Mich App at 451 ("[F]inancial hardship and unprofitability do not constitute the type of delay or failure in performance sufficient to warrant relief under a force-majeure clause."); *id*. at 452 ("The force majeure clause applies to objective events which *directly* affect the parties' ability to perform the contract in question, not the ability to make a profit . . . .") (quotation marks and citation omitted; ellipsis in original). The trial court did not err by concluding that plaintiff's obligation to pay rent was not excused under the force majeure clause.

## C. FRUSTRATION OF PURPOSE

Plaintiff next argues it was excused from paying rent during the closure period because the purpose of the lease was temporarily frustrated by the government restrictions.

The doctrine of frustration of purpose operates as an excuse for nonperformance of contractual obligations. *Liggett Restaurant Group, Inc v City of Pontiac*, 260 Mich App 127, 133; 676 NW2d 633 (2003). Generally, the doctrine is "asserted where a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract." *Id*. at 133-134 (quotation marks and citation omitted). The frustration "must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract" and "the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made." *Id*. at 135 (quotation marks and citations omitted). The following conditions must be met for a contracting party to avail itself of the doctrine:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) this purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him. [*Id*. at 134-135 (quotation marks and citations omitted).]

Here, plaintiff contends that its purpose in agreeing to the lease was to operate a health club and fitness facility and that this purpose was frustrated by the unforeseeable COVID-19 pandemic and related closure orders. Plaintiff maintains it was not at fault and did not assume the risk for such events.

-6-

However, plaintiff's argument regarding the assumption of risk is contradicted by the plain, unambiguous language of the lease agreement. In § 8.3(e) of the lease, plaintiff covenanted that it would not "use or allow the Premises to be used for any illegal purposes" during the "Term of the Lease and for so long thereafter as Tenant occupies the Premises." The above quoted force-majeure clause also excused plaintiff from paying rent if restrictive laws prevented plaintiff from paying rent. As discussed above, the closure orders did not prevent plaintiff from paying rent.

Moreover, §§ 8.1 and 8.2 of the lease provide as follows:

> **8.1 TENANT'S INITIAL USE.** Promptly following the completion of Tenant's Work and receipt of all necessary governmental and operational approvals and permits and a Temporary or Final Certificate of Occupancy, Tenant shall open for business from the Premises for one (1) day (the "Required Operating Period") for the Initial Uses set forth in Section 1.9 [i.e., the operation of a health club and fitness facility] under the trade name set forth in Section 1.11. Upon expiration of the Required Operating Period, Tenant shall have the right at any time and from time to time to cease operating the business conducted upon the Premises after giving Landlord prior written notice thereof, provided Tenant shall continue to pay to Landlord all Minimum Rent, Additional Rent and all other charges in the amounts and at the times due and payable as provided herein, and Tenant shall continue to fully perform all of the other terms and provisions of this Lease to be performed by Tenant.

> **8.2 CHANGE IN USE.** After the expiration of the Required Operating Period, Tenant shall have the right to change the use of the Building to any alternate legal use which is not expressly prohibited pursuant to Section 8.3 below or otherwise by this Lease.

Hence, plaintiff was permitted under the lease to operate a health club and fitness center on the premises, but plaintiff was not required to do so for more than one day after opening. Plaintiff could subsequently change the use of the premises to another lawful use not otherwise prohibited by the lease. Plaintiff was thus free to find a way to use the premises in any lawful way during the closure orders, and plaintiff assumed the risk that governmental restrictions limiting its use of the premises could be imposed during the term of the lease. The trial court did not err by concluding that plaintiff was not excused from paying rent under the doctrine of frustration of purpose. *Liggett*, 260 Mich App at 134-135.

D. IMPOSSIBILITY AND IMPRACTICABILITY

Finally, plaintiff argues it was excused from paying rent during the closure period because the government restrictions made it impossible and impracticable to operate its health club and fitness center.

The doctrine of impossibility and impracticability excuses nonperformance of contractual obligations when a contracting party's performance becomes objectively impossible to perform. *Liggett Restaurant Group, Inc*, 260 Mich App at 133; see also *Roberts v Farmers Ins Exch*, 275 Mich App 58, 73; 737 NW2d 332 (2007). Michigan courts have recognized two types of

impossibility: original and supervening. *Roberts*, 275 Mich App at 74. "[S]upervening impossibility develops after the contract in question is formed." *Id*. "Although absolute impossibility is not required, there must be a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Id*. (quotation marks and citation omitted).

Plaintiff asserts, because it was impossible for it to use the premises as a fitness facility during the closure period, it should be excused from its rental payment obligations. Plaintiff was not contractually required to use the premises as a health and fitness club; instead, under the lease, plaintiff was permitted to use the premises as a health and fitness facility or such other use as allowed by the lease. Conversely, plaintiff *was* contractually required to pay rent. This is the promised performance that must be evaluated for purpose of the impossibility doctrine. See *Roberts*, 275 Mich App at 73 ("A promisor's liability may be extinguished in the event his or her *contractual promise* becomes objectively impossible to perform.") (emphasis added.) Thus, even though plaintiff could not use the premises as a health club and fitness facility for a period of time, because there was no evidence proving it was impossible for plaintiff to pay rent, plaintiff did not experience an impossibility of performance for purposes of the doctrine and plaintiff is not excused from its obligation to pay rent. *Id*. Moreover, to the extent plaintiff was unable to use the premises as fitness facility and suffered a loss in revenue, "[e]conomic unprofitableness is not the equivalent of impossibility of performance," and "[s]ubsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve the contractor." *Chase v Clinton Co*, 241 Mich 478, 484; 217 NW 565 (1928). The trial court did not err by concluding that plaintiff was not excused from paying rent pursuant to the doctrine of impossibility or impracticability.

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Mark T. Boonstra

-8-